**Mitchell H. KLINE, By and Through Harriet Y. KLINE, guardian ad litem, Plaintiff and Appellant,**

v.

**UTAH DEPARTMENT OF HEALTH, Defendant and Respondent.**

No. 870441–CA.

Court of Appeals of Utah.

May 24, 1989.

Richard H. Johnson and David J. Jordan, Salt Lake City, for plaintiff and appellant.

R. Paul Van Dam, Brian L. Farr, and Ruth L. Renlund, Salt Lake City, for defendant and respondent.

Before DAVIDSON, GARFF and JACKSON, JJ.

## OPINION

JACKSON, Judge:

An incompetent person, Mitchell H. Kline, by his guardian ad litem, challenges a Utah Department of Health ("Department") determination that he is ineligible for Medicaid nursing home benefits. The Department ruled that Mr. Kline's available assets exceeded allowable limits because a durable power of attorney executed by him in 1984, while competent, amended a 1968 trust agreement and conferred authority upon his attorney-in-fact to modify or revoke the trust. We reverse and remand.

## FACTS

In 1968, Mr. Kline, as trustor, and First Security Bank, as trustee, entered into a trust agreement "to make provision for the care and management of certain of his present properties and for the ultimate disposition of the trust properties administered hereunder." The trust was identified as "The Mitchell H. Kline Family Trust." Mr. Kline designated his wife, their daughter, and her issue as the beneficiaries of

the trust. The trustee was directed to distribute net income to Mrs. Kline during her lifetime, with the trust principal and remaining income to be distributed to the Klines' daughter and her issue in accordance with Mrs. Kline's exercise of a special power of appointment in her will. Residuary beneficiaries were named in the event the Klines' daughter had no issue. In paragraph 3A, Mrs. Kline was given a discretionary power to direct the trustee to distribute trust principal to or for the benefit of the couple's issue.[1] The powers of the trustee were enumerated in twenty paragraphs, with the following limitation:

Administrative control and all other powers relating to the trust created hereunder shall be exercised by the Trustee in a fiduciary capacity and solely for the benefit of the beneficiaries of this trust. Neither the Trustee, the Trustor, nor any other person, shall be permitted to purchase, exchange, reacquire or otherwise deal with or dispose of the principal of the trust or the income therefrom for less than an adequate and full consideration in money or money's worth....

In paragraph 9 of the trust agreement, the trust was declared to be revocable and modifiable at any time *prior to Mr. Kline's death or incapacity,* as follows: (1) solely and only by the trustor, Mr. Kline, (2) by a writing, (3) executed with the same formalities as required for the valid execution and acknowledgement of deeds transferring real property, and (4) delivered to the trustee. Alternately, the trust could be modified upon death by Mr. Kline's validly executed will.

Finally, the trust agreement prohibited the beneficiaries from encumbering, transferring, or alienating their interest in the trust income or principal "during the entire term" of the trust, and their interests were declared not subject to any claim or judgment of any creditor. All of the trust income and principal was declared payable and deliverable "to or for the benefit of only" the named and designated beneficiaries.

On December 10, 1975, Mr. Kline and the trustee executed a document entitled "First Amendment to Trust Agreement." In 1984, sixteen years after creating the trust, Mr. Kline executed a general durable power of attorney authorizing Mrs. Kline to act as his attorney-in-fact. Subsequently, on February 21, 1985, Mr. Kline and the trustee executed a document entitled "Second Amendment to Trust Agreement."

By early 1986, Mr. Kline had become incapacitated by late-stage Alzheimer's disease and several strokes and was confined to a nursing home.[2] Mrs. Kline filed an application in late April on his behalf with the district Social Services office, seeking Medicaid assistance to help pay the nursing home costs incurred for his care. The application was eventually denied "due to excess assets related to a trust." After an administrative hearing at which the four documents described above were submitted as evidence and Mrs. Kline testified concerning her husband's deteriorated mental capabilities, the hearing examiner referred the trust agreement to the executive director of the Department to determine whether "the trust agreement is an available asset and should be considered in the determination of Medicaid eligibility."

The cursory analytical section of the Department's final determination treated the general durable power of attorney, dated September 27, 1984, as an amendment to the trust agreement and concluded:

---

1. This provision in the trust agreement clearly did not give Mrs. Kline the discretionary power to direct the trustee to make gifts of trust principal to or for the benefit of herself or Mr. Kline.

2. On the date application for Medicaid benefits was made, the district office worker had this information and accepted it as true. She relayed it to the Office of Assistance Payments in her request for direction about whether to consider the trust assets available to Mr. Kline. In findings not challenged in this action, the Department specifically found that Mr. Kline, eighty years old, suffers from Alzheimer's disease. The Department also adopted the hearing examiner's finding that Mr. Kline is incoherent and unable to carry on conversations about daily events. Throughout the proceedings before the agency and the district court, the Department has never claimed that, at the time of his application for Medicaid benefits, Mr. Kline was not incapacitated.

1. The trust agreement executed by [Mr. Kline] on November 11, 1968, is revocable.

2. The general power of [attorney] conferred upon the claimant's wife by an amendment to the trust agreement gives her the power to revoke, modify, alter or amend the trust.

3. The trust may be amended by the claimant's wife for his benefit.

The Department reasoned that, under the trust agreement *as amended* by the power of attorney, Mrs. Kline could exercise the reserved power to modify the trust and invade the trust corpus to pay Mr. Kline's creditor, i.e., the nursing home. Thus, the Department concluded the corpus of the trust must be considered as an asset available to Mr. Kline in determining his eligibility for Medicaid nursing home benefits.[3] Accordingly, the original decision of the Social Services district office, determining Mr. Kline ineligible because the value of the trust assets exceeded the allowable asset limitation, was sustained.

The Department's August 1986 final determination was affirmed by the district court, which reviewed the agency's decision pursuant to Utah Code Ann. § 26–23–2(3) (1984) [4] and concluded that the 1984 general power of attorney gave Mrs. Kline a power to modify or revoke the trust that was not affected by Mr. Kline's subsequent incapacity.

## STANDARD OF REVIEW

■ In an appeal from the district court's judgment after review of an administrative agency's decision, this court reviews the decision as if the appeal had come directly from the agency. *Bennion v. Utah State Bd. of Oil, Gas & Mining,* 675 P.2d 1135, 1139 (Utah 1983); *Weber Memorial Care Center, Inc. v. Utah Dep't of Health,* 751 P.2d 831, 834 (Utah Ct.App. 1988). We accord no presumption of correctness to the intervening court decision, since its review of the administrative record is not more advantaged than our own. *Bennion,* 675 P.2d at 1139.

Under the statutory standard of review set forth in section 26–23–2(3), the Department's final determination cannot be altered by a court unless it is capricious or not supported by the evidence. In order to decide if the Department's final determination is supported by the evidence, consisting of the documents executed by Mr. Kline, we must interpret the language of the trust agreement and the power of attorney and determine their legal effects. These are, of course, matters of general law completely outside the Department's area of expertise. We give no deference to the agency's pronouncements on general law issues, but review them for correctness. *See, e.g., McCune & McCune v. Mountain Bell Tel.,* 758 P.2d 914, 917 (Utah 1988) (P.S.C.'s interpretation of partnership law); *Utah Dep't of Admin. Servs. v. Public Serv. Comm'n,* 658 P.2d 601, 608 (Utah 1983) (treating finality of P.S.C. order as issue of general law and giving example of P.S.C.'s interpretation of contracts as reviewable under correction-of-error standard); *Kennecott Corp. v. Industrial Comm'n,* 740 P.2d 305, 307 (Utah

---

**3.** One of the Department's rules, adopted as a guideline for determining the availability of trust funds, states:

The entire trust is available [as an asset] if:
a. The trust was created by the client or his spouse, and
b. The client or his spouse has the right to dissolve the trust, and
c. He can use the money for his own benefit.
Utah Admin.R. 810–304–409.62(2) (1987–88).

**4.** If the final determination of the executive director is consistent with the findings of fact and conclusions of law recommended by the hearing officer, the court shall review the record and may alter the final determination only upon a finding that the final determination is capricious, or not supported by the evidence.

Utah Code Ann. § 26–23–2(3) (1984). This section was recently amended to state: "Any person aggrieved by any action or inaction of the department or its executive director may request an adjudicative proceeding by following the procedures and requirements of Chapter 46b, Title 63, the Administrative Procedures Act." Utah Code Ann. § 26–23–2 (1988). The procedures for agency action, agency review, and judicial review in the Administrative Procedures Act apply to all agency adjudicative proceedings commenced by or before an agency on or after January 1, 1988. Utah Code Ann. § 63–46b–22 (1988).

Ct.App.1987) (issues of due process denial and agency's jurisdiction); *Traylor Bros., Inc./Frunin–Colnon v. Overton*, 736 P.2d 1048, 1049–50 (Utah Ct.App.1987) (issue of fair notice to employer).

## ISSUES AND ANALYSIS

We examine first the Department's legal conclusion that the September 1984 document was an amendment to and, therefore, a part of the trust agreement, rendering the trust modifiable or revocable thereafter by Mrs. Kline as attorney-in-fact despite Mr. Kline's subsequent incapacity.

■ Absent fraud or mistake, a trustor has the power to modify a trust only if and to the extent that such a power was reserved by the terms of the trust. Restatement (Second) of Trusts § 331 (1959); *see Williams v. Springfield Marine Bank*, 131 Ill.App.3d 417, 86 Ill.Dec. 743, 745, 475 N.E.2d 1122, 1124 (1985); *Peterson v. Peterson*, 10 Kan.App.2d 437, 700 P.2d 585, 588 (1985); *Phelps v. State Street Trust Co.*, 330 Mass. 511, 115 N.E.2d 382, 383 (1953). *See also Continental Bank & Trust Co. v. Country Club Mobile Estates*, 632 P.2d 869 (Utah 1981) (refusing to construe written extension of option as amendment under terms of prior trust agreement expressly giving trustee power to grant options and delineating method of amendment). The same rule applies to a trustor's power to revoke a trust. Restatement (Second) of Trusts § 330 (1959). "If the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner or under those circumstances." *Id.* comment j; *accord Clayton v. Behle*, 565 P.2d 1132, 1133 (Utah 1977); *Estate of Button v. Old Nat'l Bank of Washington*, 79 Wash.2d 849, 490 P.2d 731, 733 (1971). In interpreting the terms of a trust, the proper focus of inquiry is the trustor's intent. *Leggroan v. Zion's Savings Bank & Trust Co.*, 120 Utah 93, 232 P.2d 746, 749 (1951).

■ A power of attorney is an instrument in writing by which one person, as principal, authorizes another to act as agent. *In re Estate of Lienemann*, 222

Neb. 169, 382 N.W.2d 595, 602 (1986); *In re Estate of Rolater*, 542 P.2d 219, 223 (Okla.App.1975). The scope of the authority so conferred may, by the terms of the instrument itself, be general or limited, but the instrument creating this agency relationship is to be strictly construed. *Rolater*, 542 P.2d at 223; *see Huntsman v. Huntsman*, 56 Utah 609, 192 P. 368, 370 (1920) (whether attorney-in-fact has power to convey principal's property for nominal consideration must be "deducible from the language or manifest intent of the [power of attorney] instrument").

■ Like most other states, Utah has adopted a statute that alters common law agency principles and authorizes the creation of a special agency relationship, through the execution of a written durable power of attorney, that does not end upon the principal's incapacity. Utah Code Ann. § 75–5–501 (1978) provides, in relevant part:

> Whenever a principal designates another his attorney-in-fact or agent by a power of attorney in writing and the writing contains the words "This power of attorney shall not be affected by disability of the principal," ... or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding his disability, the authority of the attorney-in-fact or agent is exercisable by him as provided in the power on behalf of the principal notwithstanding later disability or incapacity of the principal at law....

*See generally* Jacobs, *Possible Uses of the Durable Power of Attorney*, 7 Probate L.J. 7 (1985).

In paragraph 9 of the original trust agreement, Mr. Kline expressly reserved both the power to modify and the power to revoke the trust created in 1968. However, the trust agreement requires either power to be exercised by execution of a formal instrument delivered to the trustee or by a validly executed will upon death.

The four-page document executed by Mr. Kline in September 1984, which has the heading "*GENERAL DURABLE POWER*

*OF ATTORNEY,"* begins with his appointment of Mrs. Kline as his attorney-in-fact and agent to act

for me and in my name, place and stead and for my use and benefit, to do, perform and accomplish all of the following:

1. *General Grant of Power.* To exercise or perform any act, power, duty, right or obligation whatsoever that I now have or may hereafter acquire, relating to any person, matter, transaction or property, real or personal, tangible or intangible, now owned or hereafter acquired by me, including, without limitation, the following specifically enumerated powers. I grant to my attorney[-in-fact] full power and authority to do everything necessary in exercising any of the powers herein granted as fully as I might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that my agent shall lawfully do or cause to be done by virtue of this power of attorney and the powers herein granted.

. . . .

Subparagraphs a-h enumerate specific powers delegated to the attorney-in-fact, including tax and banking powers, power to obtain title to motor vehicles, powers of collection and payment, and real estate and business management powers. Paragraph 2 states that the instrument is "to be construed and interpreted as a general durable power of attorney."

In accordance with section 75–5–501, paragraph 4 states: "This General Durable Power of Attorney shall not be affected by my disability or incapacity." This language demonstrates Mr. Kline's clear intent that Mrs. Kline's authority to act as his agent would not cease, i.e., was "durable," beyond the point at which he later became disabled or incapacitated.

Although this written power of attorney was acknowledged before a notary, as amendments to the trust were required to be, there is nothing in it to suggest Mr. Kline intended the power of attorney instrument to operate as an amendment of, and addition to, the 1968 trust agreement. There is no general reference to any trust or any trust agreement, and no specific reference to the Mitchell H. Kline Family Trust or the trust agreement between Mr. Kline and First Security Bank dated November 11, 1968.

When Mr. Kline meant to amend the trust, it is apparent he knew how to demonstrate his intent to do so. The record before the Department contained two other documents executed by Mr. Kline, one after the execution of the power of attorney. The December 1975 document, which has the heading *"AMENDMENT TO TRUST AGREEMENT,"* identifies the trust by name and date and states:

WHEREAS, pursuant to the provisions of paragraph 9 thereof, TRUSTOR reserved the right to amend said trust prior to his death or incapacity by a writing executed with the same formalities as are required for the valid execution of deeds transferring real property; and

WHEREAS, it is the desire to amend a certain provision of said Trust Agreement as hereinafter set forth. . . .

Then paragraph 3C(4) of the original trust agreement is deleted and a new paragraph substituted, designating three new beneficiaries in the event of the death of his daughter without issue. The amendment was signed by Mr. Kline and the trustee.

The second amending document, captioned *"SECOND AMENDMENT TO TRUST AGREEMENT,"* was executed in February 1985, five months after the power of attorney document. We note that this instrument is identified as the second, not the third, amendment to the trust. It makes the same references to the trust, trust agreement, and reserved power to amend the trust and then specifically deletes paragraphs 3C(3)(a) and 3C(4) and substitutes new language in their stead. This amending document was signed by Mr. Kline and the trustee.

After reviewing the documents in the record, we conclude that the September 1984 document is only what it purports to be, i.e., a durable general power of attorney, not an amendment of, or addition to, the trust agreement. It is simply a broad delegation of authority to an attorney-in-

fact and a declaration of intent that the agent's authority not terminate upon the principal's disability or incapacity. The Department's conclusion that the power of attorney is an amendment to the trust was in error.

 We turn next to the issue of whether the powers reserved by Mr. Kline in the trust agreement survived his incapacity. We will assume, *arguendo*, that the reserved power of revocation or modification was delegable by Mr. Kline to an agent by means of a power of attorney and that Mr. Kline intended to delegate the authority to exercise those reserved powers to his attorney-in-fact in the broadly phrased general grant of powers in the power of attorney, quoted above.

In order to determine the nature and duration of those reserved powers, we must look to the intent of the trustor as expressed in the trust agreement. In paragraph 9, Mr. Kline expressly provided that the powers to amend or revoke the trust, which he was reserving to himself, would last only until his death or his incapacity. The duration of both powers is, therefore, limited. While he lives, the powers continue. When he dies, they end. While he has capacity, the powers continue. When he becomes incapacitated, they end. Although Mr. Kline could have amended the trust, while still competent, to remove this limit on the life of the reserved powers, he did not. When he became incapacitated in early 1986, the reserved powers to amend and revoke the trust expired and could not be exercised thereafter by Mr. Kline or by his attorney-in-fact.

Perhaps because both the power of attorney and the original trust agreement refer to the contingent event of Mr. Kline's incapacity, the Department erroneously viewed the "durability" language in paragraph 4 of the power of attorney, quoted above, as overriding the express provision in the trust agreement that the reserved powers would terminate upon his incapacity. In concluding that Mrs. Kline could modify or revoke the trust to make its assets available to Mr. Kline, the Department misconstrued the durable power of attorney.

That document extends the agency relationship beyond the point of the principal's incompetency; it is durable. But that document does not alter the nature and duration of the powers reserved in the trust. In short, the fact that the power of attorney is durable does not make the reserved power durable. Even if the powers reserved in paragraph 9 of the trust agreement were delegated to Mrs. Kline in the power of attorney, they can no longer be exercised by her as Mr. Kline's attorney-in-fact to revoke or modify the trust in any way.

The Department's final determination that the trust is revocable and the trust assets are, therefore, available to Mr. Kline is not supported by the evidence. The judgment of the district court is reversed. The case is remanded to the district court for entry of a judgment setting aside the Department's final determination and remanding the case to the Department for further proceedings consistent with this opinion.

DAVIDSON and GARFF, JJ., concur.